Again, I am Alicia Gota from the UW School of Law, and with me at council table are Eric Schnapper and Leonard Feldman, supervising attorneys, as well as students Ian Carnes and Teresa Damonte. I've reserved three minutes for rebuttal, which Mr. Carnes will deliver. If I may proceed? Please do. Thank you. The state controls all channels through which prisoners request and receive religious services, and the state cannot prevent certain prisoners from receiving those services based on the state's own view of whether or not a prisoner is a member of a given religion. So, for example, the state cannot restrict prisoners to a single channel for obtaining a Koran and then prevent a Shiite prisoner from obtaining that Koran through that channel because in the state's eyes that prisoner is not Muslim. The record suggests that one of the concerns here is the cost of kosher meals and that inmates are abusing the privilege, so to speak, by trying to get better food. Is that a legitimate peniological interest that the state can rely on to defeat an otherwise legitimate claim of entitlement to religious services and material? Your Honor, I would point out first that this case is regarding the access to materials and religious instruction. It's not actually... For a kosher diet as well. There's more than just religious material here. That's correct, Your Honor. He does ask for a kosher diet. And that is more expensive than the average cost per meal to inmates in the general prison population, is it not? Your Honor, I don't have the answer to that question because although he does request a kosher diet, that is the subject of a separate suit. And this suit focuses in particular on whether or not Mr. Fuller had access to a Torah, a Jewish calendar, and other religious services. Counsel, I've got a question for you. My question is this. My understanding is that in this case, the district court did not make any determination whether Mr. Fuller should be treated as Jewish or whether there's an undue burden on religious practice. Rather, the court said there's no state action. Assuming all that stuff's true, there's no state action. So am I correct that if we disagree with that, that we would reverse and remand to the district court to address all other issues? So that the issue that my colleague, Judge Tallman, seemed to be raising is separate from state action and is an issue on which I thought the district court did not rule. That's correct, Your Honor. Okay, so why don't we just focus on, for now, from my perspective, I suggest you get right to state action. Thank you, Your Honor. I'll do that. The defendants in this case are state actors under both the government function test in West and the joint action test in Lugar. I'll turn first to West. The prisoners solely rely on the state for accommodation of their religious needs, and the state exclusively authorized the defendants to accommodate those needs. This is analogous to the situation in West, in which the physician was the person solely authorized to attend to prisoners' medical needs, and prisoners relied exclusively on the state. For that reason, the defendants are state actors because Mr. Flores' only route to access the religious services and materials that he sought were through the defendants. And the evidence for this is in the record. In some of these cases, we find that the prison has what they call a chaplain, and it constitutes an office that is a funnel for all these religious questions. The chaplain doesn't necessarily make the determination as to the sect or group that the prisoner belongs to, but relies on outside opinion. Now, isn't that opinion independent of the prison and not state action? In this case, Your Honor, it was not. The prison did have that system in place whereby the prisoners had to funnel all of their requests through the facility chaplain, but the facility chaplain would only provide services and materials to the prisoners if the defendants concluded that the prisoner could receive those materials because they were Jewish pursuant to Jewish law. Yes, but the chaplain would consult outside sources, not prison employees, and were not associated with the prison in any context. They were associated with the sect or religious group to which the prisoner belongs or may belong. In this case, Your Honor, the reason that the contractors were state actors is because they maintained exclusive control over whether a prisoner were to receive religious services or other materials. I thought that was the role of the chaplain, who actually did the furnishing of the goods or services that are required to meet the religious need, but the authorizing authority essentially was independent of the prison. The authorizing authority was not, in this case, independent of the prison because the state, together with the defendants, created a system under which the defendants had the final call. So, for example, if the defendants concluded that under their reading of Jewish law a prisoner was not Jewish, there was no way for that prisoner to obtain religious services or items such as a Torah or a Jewish calendar. And it's for that reason, under the test in West, that the defendants are state actors here. It goes to their exclusive control. So the fact that the facility chaplain turned to somebody who was a contractor and not a direct employee of the prison doesn't bar state action in this case. Well, didn't they turn to a rabbi in this case? In this case, I believe that Mr. Friedman, who I'm assuming that's who you're referring to, is not a rabbi, but he functioned as the religious advisor. The president of his congregation, as I understand, but not a rabbi. Exactly, Your Honor. Okay. Your Honor, you referred to the ability of the facility chaplain, or rather the responsibility of the facility chaplain, to control all items to distribute to prisoners. And as I said, that was the case here. And there's also a statement by the religious program manager. Your Honor, I'd like to get back to the question, which I think is touched upon by the prior line of questioning I asked you, and that is what's wrong with the prison chaplain asking for an outside opinion from the congregation as to whether or not this inmate is, in fact, a legitimate Jewish adherent, and therefore entitled to such services. It seems that we're asking the state to become pretty heavily involved in determining who is a believer or not. And there are some cases that suggest that that's an inappropriate role for the prison to take. If the congregation, for example, I think it was the Presbyterian group, expelled one of its members for ecclesiastical reasons. Isn't that really what we have going on here? Your Honor, I want to check. I believe that I am out of time, as I wish to reserve three minutes for rebuttal. Okay. We'll add a minute or two to your time. Thank you, Your Honor. In response to your question, the state cannot determine on a religious ground whether or not a prisoner is a member or is not a member of a given religion. And what they also cannot do is they can't turn, under this Court's reasoning in Swift v. Lewis, to an outside source to make that determination and then predicate delivery of religious services on that basis. What the state can do is what this Court concluded in Shakur v. Shryo in 2008. They can question whether a prisoner sincerely believes and whether that belief is religious. Isn't that what's going on here? Isn't that what we're asking Mr. Friedman to tell us? No, Your Honor. We're asking Mr. Friedman to tell us, in this case, is this person a member of the Jewish religion according to your reading of Jewish doctrine? Right. And that's the difference. I thought that the district court made no finding as to whether Flora had a sincere belief that he was Jewish or entitled to practice Judaism. That's correct, Your Honor. It did not address that question. The district court concluded, or rather the district court did not address sincere belief in its opinion. Okay. Do you want to pause and let your colleague handle rebuttal? Yes, Your Honor. Okay. Thank you. Okay. Now Ms. Olson for the state. Good morning. May it please the Court. My name is Sarah Olson. I'm an assistant attorney general. I'm here representing the defendant appellees, Congregation Pidgim-Shevim, Jewish Prisoner Services International, and Gary Friedman. Throughout my portion of the argument, I will be referring to the defendant appellees as the congregation. This court should affirm the lower court's ruling that a private religious organization is not a state actor. The U.S. Constitution requires that the state not interfere with an offender's ability to practice their sincerely held religious beliefs. The courts have interpreted that to mean that the state is to provide access to religious services. In the present case, we need to look at two different venues. The first is what the state had an obligation to provide and what they did provide and what the congregation was asked to provide. Here the state is required to provide access. Mr. Flohr was given the opportunity to fill out a religious preference form indicating that he was Jewish. He did so. As soon as he filled out that form and filed it with the Department of Corrections, he was given access to Jewish services. That access included a kosher diet, which he did receive. It included communication with outside religious advisors, which Mr. Flohr clearly had, not only with the congregation but also with two different organizations whose letters are contained within the record. In addition to that, he was to be given access to request materials. Not only did he have the opportunity to request materials, which he did from the congregation, but he was given materials. Included in the court record at SCRs 185-191 and 334-337 are materials that Mr. Flohr was provided by the prison chaplain because he said he was Jewish, and those materials were presented to the court in support of Mr. Flohr's briefing. So everything that the state is required to provide, every access, every avenue of access was provided by the state in this case. I have a question for you, and I'm going to apologize because it might be a really dumb question. But here it seems to me the key issue is whether the congregation has engaged in state action. Yes. Okay, and so now you're a state lawyer. I am, yes. So like a sort of question, well, if the congregation isn't engaging in state action, why is the state's lawyer arguing the congregation's case? It is not a stupid question. It's a valid question. Under RCW 4.92.060, the state attorney general's office has the authority to represent volunteers and contractors who work with state agencies. The congregation would not be before this court but for its volunteering and contracting with the Department of Corrections. So the attorney general's office has exercised its authority in agreeing to provide representation. If the court should conclude that we are not a state actor, or that the congregation is not a state actor, the attorney general's office would not be representing the congregation further. So if he were sued again independently by Mr. Flohr after a determination had already been made that they are not a state actor, the attorney general's office may or may not exercise its discretion at that point. What's your response to Ms. Jugota's citation to the Swift decision? Excuse me, the Swift decision, correct me if I'm wrong, I believe that's the inherent governmental function test. Well, it's the case where they basically relied on an outsider to determine who was a Sikh for purposes of making the decision as to which inmates got to wear their hair long. I appreciate you refreshing my recollection. I have a case here if you'd like to read it. Thank you, I actually have it over there as well. The issue here is not Mr. Friedman or the congregation making a determination about who is not Jewish for purposes of receiving what the state is obligated to provide. The state made an independent determination based on Mr. Flohr filling out a religious preference form saying that he's Jewish to provide him with all accoutrements that are provided to Jews within the Department of Corrections. Whether or not the congregation determined under Jewish law that he was or was not Jewish was not relevant to him receiving the access that the state is obligated to provide. The congregation was acting in a purely ecclesiastical capacity when they made a decision to say, until you fill out this questionnaire documenting that you are Jewish under Jewish law, we can't provide you with the services that you're looking for. Ms. Yugota is arguing that our SWIFT decision supports her theory that what we have here is joint action between the congregation and the state in making the determination as to who gets the access. And if the facts were similar to SWIFT, I would agree. Unfortunately, well, actually fortunately in this case, there is nothing within the contract or within the volunteer relationship that delegated the authority to determine who would receive access to Jewish services to the congregation. So your position is that it was just seeking advice, but that it was the prison chaplain who made the ultimate determination? I wouldn't actually go that far, Your Honor. They weren't seeking the advice of the congregation in determining who received access to Jewish services within the department. That decision was made solely by the offender who filled out a form.  So what is it that he did not get that led him to bring this suit then? The claim in his complaint is he did not receive religious materials and spiritual leadership. There's been no definition of what he considered spiritual leadership. However, the record demonstrates that he did receive Jewish religious materials. And I would point out additionally that the contract that existed between the department and the congregation did not require that the congregation provide religious materials to any offender. So the problem I'm having in assessing this is, at least in part, that answer goes to the merits. Like if there was state action, maybe his claim loses on summary judgment because he got everything he was supposed to get and his faith wasn't unreasonably burdened. But the issue is, at least as I saw how, the district court dealt with it was limited to whether there's state action. So we've got that West doctrine involving the physicians acting for the prison and we've got the cases involving joint action like the one Judge Tallman mentioned. And if those cases are satisfied, don't we have to send it back and say, you made a mistake on state action and now handle the other issues? Your Honor, of course, it's procedurally correct. If this court makes the determination that state action was involved, then yes, it would have to be remanded. The distinction here that Ms. Yagoda and the appellant seems to point out repeatedly is some sort of exclusivity. And that would make this case fall within the purview of West. If there was some sort of exclusivity within the contract, that Mr. Flohr only could contact the congregation to get any sort of spiritual access. There is no exclusivity caused in the contract. He did get access, did he not, to the services of the, well, they're not really volunteers, the contractor rabbis. He did. There's no allegation that he was ever refused access to a service that occurred on prison grounds. There's no allegation that the congregation ever said, you can't walk through the door and participate in Jewish services. He did receive the access necessary. That makes it different from the West case because the West case had an exclusivity provision. The plaintiff in that case could not access medical services from anyone other than the contract physician. That's not the case here. It is clearly demonstrated by the record by the fact that Mr. Flohr had contact with at least two other Jewish organizations, and he also received religious materials. There was no exclusivity that would make West governing on this issue. With regard to the joint action test, again, there is no reliance on the congregation to determine who is or is not Jewish for receiving access to Jewish services within the Department of Corrections. That is all done exclusively by the department. The only role that the congregation played is making a determination about who they were going to provide their ecclesiastical services to, and the contract expressly and the law expressly allows them to make those ecclesiastical decisions as a private citizen, not as a state actor. So let me ask this, and I don't know how firm these facts are, but I seem to read in the briefs that the congregation would not give Jewish services to someone if they weren't Jewish under Jewish law, and specifically either their mother was Jewish or they'd gone through the formal procedures to convert. So what about a case where someone's father was Jewish? Say you've got a prisoner whose father was Jewish, but their mother wasn't, and their whole life they kind of identified with the Jewish community. I don't know if they were bar mitzvahed or not, but they viewed themselves as Jewish. If they get into trouble, end up in this prison, do they not get all the help from the congregation? I cannot answer that question because precisely for the reason that we're here, that falls into the purview of an ecclesiastical determination. My understanding of Jewish law is that if you're not born of a Jewish mother or completed an Orthodox conversion, you are not considered Jewish under Jewish law. But that's my understanding as Sarah Olson standing before you, not as the State Attorney General's office. But is it proper for the government to say that on a question of that nature, we have hands off and it's entirely up to a religious organization? Not only do I believe that that's proper, but I believe that's what the Constitution requires. The Constitution says that we can't interfere. The Establishment Clause prevents the department from promoting a religion. The Washington Constitution similarly prevents the department from spending state dollars promoting any type of religion other than paying for a chaplain to perform at the university. All right, but now you've said the prison made a decision based on Mr. Floor's form that they would treat him as Jewish in the sense of giving him materials and a kosher diet, right? Giving him access, yes. Access to materials and a kosher diet. Correct. But if he wants access to a spiritual leader, then I guess the prison is saying, well, we're not going to give you that. That's up to the spiritual leaders. Yes, no state employee provides spiritual leadership. The spiritual leadership comes from outside providers. And so in your scenario, if an offender who was raised Jewish, who entered the Department of Corrections, and who was not Jewish under Jewish law, according to the provision of services provided by the congregation, the offender would have the ability to seek out services from other providers. There may be other providers who would provide Jewish spiritual leadership to that particular offender. So you read your contract with the congregation that if the state is paying $16.87 an hour for rabbis to come to the prison to provide Jewish services to Jewish prisoners, and a prisoner asks to meet with that rabbi, the rabbi can refuse to meet with the prisoner for Orthodox reasons. Is there specific terminology within the contract that gave the contractor that right? Yes. So what's the state's position if one branch of Judaism takes one position about who's a Jew, and another branch takes another position? Because they have Orthodox, conservative, and Reform groups, probably some subgroups. So if the prison's contractor is in Group A and takes one philosophy, but the prisoner would get something more from a Group B rabbi, then they get shut out? They don't get shut out because there's not an exclusivity provision within the contract. There's nothing in the contract that says that other Jewish religious volunteers are precluded from coming within to the institution. This is certainly outside the record, whether or not there were other Jewish volunteers who came in. And if your offender came in today, this wouldn't be an issue because the congregation no longer has a contract with the Department of Corrections. They now operate on a purely volunteer basis. Well, thanks. I took you over your time. Thank you. Yes, you did. Thank you. We would ask that the lower court's decision be affirmed. Thank you. I kind of guess that's your position. Okay, the reply argument on behalf of Mr. Flohr. We have another student. This is Mr. Schnapper. My name is Ian Cairns, and as my co-counsel has said, I'm also a student at the University of Washington. So, Mr. Cairns, what is it that we're not providing to your client? I'm confused now. The record indicates that although Mr. Flohr did eventually receive some materials, that there was a period of delay and that he was without the materials and the guidance that he sought. So I think that speaks to the magnitude of the injury. What materials? A Torah, a Jewish calendar, and a consultation with the rabbi. And a kosher diet? Like my co-counsel said, that has been carved out into a separate case. Well, I'm still not sure I have it. Either he got it or he didn't get it. He did eventually get a kosher diet, and that's not why we're here. We're here for the denial of the Torah. For the delay. He has it now. He eventually did get it, but again, I feel... From the congregation or from some other source? It appears it was donated from the congregation and funneled to the facility chaplain. Okay. What does that do to your exclusivity argument? Well, that's exactly what I'd like to point out. The opposing counsel has essentially conceded that if there's exclusivity and if there's joint action, and the defendants made the final call on who received those materials, there is state action. So the evidence for the exclusivity appears at several places in the record. First, a department policy, religious freedom policy 560.200, which says that requests for these materials have to be made to a facility chaplain. Then at page 194, Dan Williams states, the religious program manager of the Department of Corrections states that in 2004, the period relevant to this lawsuit, it was department policy to refer all requests for Jewish materials to the defendants. Furthermore, there's another communication from Dan Williams that reads, in order to determine the validity of an offender's claim to being Jewish, chaplains are expected to contact Gary Friedman, the Jewish advisor to the DOC. Isn't it true, as Ms. Olson pointed out, that the contract with the congregation doesn't require them to provide materials? It requires them to provide state-paid rabbis who, when they're on the premises of the prison, are available to meet and provide services, correct? Correct. Your Honor, we've never argued that the defendants or the state has an affirmative obligation to provide any materials. It's that the nature of this exclusive relationship prevented any access because if the defendant said, you're not Jewish according to Jewish law, you don't get anything. And that's the problem. So is the record that if an inmate wrote to a different congregation or some other source for these materials, that the prison would not allow a Torah to be mailed in from someplace else? Yes, Your Honor. There is evidence that the defendants had the exclusive call on who was Jewish and thus got these materials. So the congregation would have to make the determination that they are Jewish, otherwise the chaplain would not permit them to possess a Torah? Yes. Where in the record can I find that? You can find that in several places. One, 240, where I just said that Dan Williams, a religious programmer, says that facility chaplains are expected to contact Defendant Friedman to determine whether or not an inmate is Jewish. Also, you can find it at the Declaration of Dan Williams, which I believe is at page 194, where he says, it's department policy to refer all requests for Jewish items to the defendants. And so, again, as my co-counsel said, this exclusive sort of gateway relationship is the problem here. And it's precisely what the Supreme Court recognized in West, is that what's going on here is the state is trying to abrogate its constitutional duties by outsourcing them, and that simply can't happen. Okay. Well, we were giving you two extra minutes, but we've used that, I think. Yes, I appreciate it. If you could bring your argument to a close. Yes, Your Honor. Again, I'm very appreciative for the time. So we're simply asking that, as Your Honors have pointed out, the issue of state action, we ask that you reverse the district court's finding of no state action and remand for proceedings consistent with such an opinion. Thank you. Okay. Thank you very much. Well, we appreciate the pro bono efforts of the law school and of Mr. Feldman, and we appreciate the fine argument of the students and of Ms. Olson. So we've got a lot to think about, and we will. Thank you. And the good work of the advisors. Thank you.
judges: Beezer, Gould, Tallman